## In re SHATZ.

(District Court, E. D. Pennsylvania.   June 4, 1918.)

### No. 5637.

1. BANKRUPTCY ⬤325—CLAIMS—INDEBTEDNESS AS INDORSER.

Holder of a note indorsed by a bankrupt, not due at the time of bankruptcy, but which became due before proof of claim, and on which in the meantime a payment was received from the maker, can prove only for the amount due thereon at maturity.

2. BANKRUPTCY ⬤355—DISTRIBUTION OF ASSETS—"SECURED CREDITOR."

A "secured creditor" is one who directly holds as security for his debt property which would otherwise swell the assets of the bankrupt estate, or indirectly holds like property through having the debt obligation of another person who himself holds such property.

[Ed. Note.—For other definitions, see Words and Phrases, First and Second Series, Secured Creditor.]

In Bankruptcy.   In the matter of Lewis A. Shatz, bankrupt.   On review of order of referee allowing claim of Metropolitan Bank. Modified.

Alfred Aarons, of Philadelphia, Pa., for petitioner.
J. Howard Reber, of Philadelphia, Pa., for claimant.

DICKINSON, District Judge.   On or about November 1, 1915, the Metropolitan Bank discounted a four months note for $10,000.   As holder of this note the bank filed amended proofs of claim in the sum of $10,000.   The note was made by the 35 per cent. Automobile Supply Company, with the bankrupt as accommodation indorser.   The maker of the note had with the bank a deposit of $2,229.28, which the bank appropriated and applied toward the payment of the note.   The maker of the note was also adjudicated a bankrupt, and from its estate the bank received dividends of $700, and of $500 from its trustee.   The dates of these respective payments are later stated.   There has yet been no final distribution in the bankrupt estate of the maker of the note. The proofs of claim were filed on March 26, 1917.   Shortly after the discount of the note, to wit, on November 18, 1915, a petition in bankruptcy was filed against the indorser, and on November 19, 1915, the maker made a general assignment for the benefit of its creditors.   On this latter date the bank, in some way, succeeded in appropriating towards the payment of the note the balance standing to the credit of the maker, as before stated.   A petition in bankruptcy was filed against the maker on November 23, 1915, and it was adjudicated a bankrupt on December 20th following.

The pertinent dates referred to may be presented in one view as follows: November 1, 1915, discount of note for $10,000; November 18, 1915, petition in bankruptcy filed against the indorser; November 19, 1915, assignment by the maker for the benefit of his creditors, and appropriation by the bank of the deposit balance of the maker of the note toward its payment; November 23, 1915, petition in bankruptcy against the maker; March 1, 1916, maturity of the $10,000 note;

⬤For other cases see same topic & KEY-NUMBER in all Key-Numbered Digests & Indexes

dividends out of the estate of the maker of the note, aggregating $1,200, received by the bank; March 26, 1917, proof of claim (as amended) for $10,000 by the bank on the note.

The objections made to the allowance of the claim of the bank are based upon the payments above referred to, and that the bank may be in receipt of further dividends from the estate of the maker. The claim of the bank is that it is entitled to receive dividends from the estate of the maker, and is also entitled to receive dividends from the estate of the indorser up to the full amount of its claim. The dates of the payment of the dividends do not definitely appear, but the fact is assumed that they were declared and paid between the date of the maturity of the note and the proof of claim by the bank against the estate of the indorser. The referee allowed the bank a dividend based upon $10,000, the full face of the note.

[1] The petition for review is based upon the proposition that the claim should have been allowed only for $6,570.72, being the $10,000 less the amounts, as above mentioned, received on account. The first impression of the general merits of the claim made by the bank and the position of the petitioner is determined, or at least largely influenced, by the point of view from which the practical results are viewed. The maker and the indorser having each made themselves liable to the bank for the repayment of the sum of $10,000, from the viewpoint of the bank it is thought right that the bank should be permitted to press its claim against each up to the point of its receipt of all that is justly payable to it. From the standpoint of the indorser, there is not only an injustice, but an absurdity, in the position that the bank could have by any possibility a claim against the indorser greater than its claim against the maker.

The referee, in making his finding, has followed the line of reasoning pointed out in Board of County Com'rs v. Hurley, 169 Fed. 92, 94 C. C. A. 362. This line is that the claim of creditors to share in a bankrupt estate is not based upon a claim of debt, but upon a claim of ownership of assets, their share in which is measured by the amount which their debtor owed to them at the time of the filing of the petition in bankruptcy against him, and the relation of the amount of this indebtedness to the total amount of claims proven in the bankrupt estate. The share of assets thus determined is fixed as of the date of the petition in bankruptcy. We may observe, in passing, that the amount of the claim provable in the Hurley Case against the estate of the surety had been reduced, if at all, by dividends received by the claimant after the filing of the petition in bankruptcy against the surety, and after the obligation held by the creditor had matured.

The scope of the ruling in the Hurley Case is indicated in the case of In re Simon (D. C.) 197 Fed. 105. There claims were sought to be proven against the bankrupt estate of an indorser. The question was whether the claims could be proven for the amount of the original indebtedness, or for the balance after amounts paid by the makers subsequent to the filing of the petition in bankruptcy against the surety had been deducted. The referee allowed the claims only for such balances. This ruling was reversed by the court, and the claims al-

lowed for the original sums due. Here, it is to be again observed, the sum proven was the sum due at the time of the filing of the petition in bankruptcy against the surety.

The doctrine in the Hurley Case was again applied in Re New York Commercial Co., 233 Fed. 906, 147 C. C. A. 580. There the claims were permitted to be proven for the original sum of the indebtedness on the express ground that the reduction of the debt was subsequent to the bankruptcy of the one against whose estate the claim was sought to be proven and after the liability had become fixed. The abstract proposition laid down by the court in the cited case is that the claimant had a right to participate in the estate of each of the two bankrupts, and a right to prove against each for the full debt, and could assert this right against each, unaffected by the fact that there was also a like right against the other, subject only to the limitation of the receipt of the total amount which was due him. Here again, however, both the specific allowance and the limitation of the abstract proposition indicate that the sum for which claims could be proven against each estate was limited to the sum which was due by the bankrupt in that estate at the time of the filing of the petition in bankruptcy in that estate.

As the claim of the bank against the indorser on November 18, 1915, the date of the filing of the petition in bankruptcy, is measured by $10,000 (less the discount until the maturity date of March 1, 1916, which reduction has been treated as a negligible sum), the referee was logically led to his finding that the bank could prove its claim in the sum of $10,000. The finding, however, ignores the other fact of a less sum being due when the note matured.

The petitioner contests the correctness of the finding made by the referee on several grounds, which we will consider in a somewhat different order from that in which discussed by counsel.

One is that the line of cases which the referee followed is out of accord with the decision of the Supreme Court of the United States in Merrill v. Bank, 173 U. S. 131, 19 Sup. Ct. 360, 43 L. Ed. 640. The discussion of the principles of law involved in that case had reference to the distribution of the assets of an insolvent national bank. A creditor was allowed a dividend upon the face amount of his claim as it stood at the time the bank went into insolvency, notwithstanding the fact that the creditor held collateral security and had received payment on account of his claim after the insolvency had been declared, but before award to him of his dividend, subject, of course, to the limitation that he was entitled to no dividends after payment of his claim in full. The opinion of the court formulates a statement of the different schemes of distribution recognized. The courts of different jurisdictions are sometimes directed in the choice made among these several schemes by statutory requirements. There is, in some instances, a concord in the acceptance of the principle of distribution, as, for instance, that the share of the creditor is determined by what is due him at the time he acquired an interest in the assets which are the subject of the distribution; but there is a difference in the fixing of this time. The Pennsylvania rule is that the time is

251 F.—23

that of the act of transfer through and by which the creditor gets his equitable claim to the assets, and the principle is recognized and followed that the creditor receives dividends, not qua creditor, but qua owner; the size of the debt being merely the measure of the ownership share.

The principle underlying the scheme of distribution followed in the Merrill Case is that known as the "chancery rule." The opposing principle, that a creditor holding property as security and having also a debt obligation was required to exhaust his security, and after crediting the sum thus realized to claim only for the remainder of the debt, or as the cost of his right to claim a dividend upon the whole sum due him, he was required to surrender and put into the fund for distribution the security which he held, is known as the "bankruptcy rule." It is so known, not by virtue of any special provisions of bankruptcy statutes, but because of the "peculiar" jurisdiction and practice of courts of bankruptcy. The distinction, however, was universally recognized between cases in which the creditor held property, otherwise a part of the bankruptcy estate, as security for his debt, and the cases in which he held property, not the property of the bankruptcy estate, or in which he held no property, but two or more debt obligations for the same debt, with the right to make demand against different estates. If he held the property of his bankrupt, the bankruptcy rule applied, and he must surrender, or claim only for the unsecured balance of his account. In the other cases, however, he could assert his claim for its full face value against the different assets, subject to the limitation that he was not entitled to an overpayment.

Much may be said—in fact, has already been many times said—in respect to the abstract equity of the one plan of distribution or the other, in the contrasting of their respective claims to merit. The choice made is probably controlled wholly by the viewpoint. The essential thing is to have an established rule and to apply it. As distribution is being here made by a court of bankruptcy in a bankruptcy proceeding, the paramount consideration is the provisions of the bankruptcy statute.

[2] The definition of a "secured creditor" is a creditor who directly holds as security for his debt property which would otherwise swell the assets of the bankrupt estate, or indirectly holds like property through having the debt obligation of another person who himself holds such property. The thought of there being security held by the creditor in the form of property is carried all through the provisions of the statute, and the right of the creditor to enforce the individual obligation of another person to pay the debt of the bankrupt is recognized in the provision permitting such other person to prove, in the name of the creditor, the claim against the bankrupt's estate, if the creditor does not elect to do so on his own account.

With the distinctions above indicated kept in mind, we see no conflict between the rulings in the Merrill and Hurley Cases. The point made that the Merrill Case rules that distribution of the assets of an insolvent national bank was to be made in accordance with the so-

called chancery rule, and not in accordance with the so-called bankruptcy rule, is a point well taken; but the corollary proposition cited by counsel for the petitioner, that the so-called bankruptcy rule was not followed by the referee, is a proposition the truth of which is not demonstrated.

The further objection, that the Hurley Case is not in accord with the ruling of the courts of this circuit and district, is so well met in the opinion of the referee that we see no occasion to further follow this branch of the discussion.

The other objection made, that the bank at the time of the filing of the petition was not a creditor of the bankrupt estate of the indorser, is an objection not sustained by the cases cited to us in the argument submitted. On the contrary, the case of In re Gerson (D. C.) 5 Am. Bankr. Rep. 89, 105 Fed. 891, sustains the right of the creditor to prove such a claim.

There are two main thoughts involved in bankruptcies. The one which has become the dominant thought, although at first not so, is the purpose of an equable distribution of the assets of the estate among all creditors. The other is the release of unfortunate debtors from the obligation of debt. It is true, in a very obvious practical sense, that a man who has taken upon himself the liability of the indorser of unmatured negotiable paper does not before maturity owe the holder of that paper anything as yet. There is, however, the obligation to pay. It is true that the obligation is not absolute, in the sense of being unconditional; but it is nevertheless an obligation which may ripen into an absolute debt. The obligation is contingent, in the respect that it becomes a debt or no debt according to subsequent happenings. It is sufficient for all present purposes to state the proposition that the holder of this kind of an obligation of the bankrupt may make proof of the obligation, and take his stand as a creditor, if he eventually becomes such.

This brings us to what in our view is the crucial point in this case. What is the obligation which the bank in this case held? It was, among other things, the obligation of the indorser bankrupt to pay this $10,000 note if (among other ifs) it was dishonored in whole or in part at maturity, or, in other words, to pay it if the maker did not. The holder of such paper has the right to prove the obligation of the bankrupt indorser; but whether this obligation results in a debt is dependent upon whether it develops into a debt, and this cannot be determined until the maturity of the obligation. If, for illustration, the note is not protested for nonpayment, and no notice of its dishonor is given to the indorser, or if any of the other happenings upon which his obligation to pay rests did not come to pass, the obligation does not become a debt. What, therefore, was the obligation of this indorser at the time of the maturity of the note? Was it to pay the bank $10,000, or was it to pay $7,770.72? If there had been no bankruptcy intervening, it is clear that the bank could have demanded of the indorser only the lesser sum above mentioned, because the maker of the note had in part met his obligation by the payment of $2,229.28, and the obligation of the indorser was to pay only to the extent to which the maker failed

in payment. What is there in either the filing of a petition in bankruptcy against either the indorser or the maker, or both of them, to enlarge the obligation of the indorser beyond what it would have been otherwise? We have been unable to find any other answer to the question than that the obligation of debt is unaffected by either or both bankruptcies.

We are in full accord with the very clear and satisfying reasoning of the referee, and accept the conclusions to which that reasoning leads; but the question remains whether the referee has not misapplied the principles of law which he has so well and clearly stated by overlooking the fact that one of the payments which was made on this note was a payment made before maturity by the maker in satisfaction pro tanto of his obligation to pay, and that in consequence the obligation of the indorser to pay, if the maker did not, is reduced to that extent. In this view of the rights of the parties, the claim of the bank should have been reduced by all payments made before the maturity of the note. We understand the fact to be that the $1,200 received in dividends was received after the dishonor of the note, and that the only payment which goes in reduction of the probable claim of the bank is the $2,229.28 above mentioned.

Inasmuch, however, as there is no specific finding which we have been able to discover in the record of when the dividends were received, the petition for a review is granted, and the order made by the referee is reversed, in order to enable him to make the modification above outlined, and with directions to allow the claim of the bank at the sum due upon the note on March 1, 1916, when it became payable.