Iscovitz's Estate.

Argued April 24, 1935. Reargued May 29, 1935. Before FRAZER, C. J., SIMPSON, KEPHART, SCHAFFER, MAXEY and DREW, JJ.

278

[redacted]

*Gabriel D. Weiss*, with him *Charles S. Schermer*, for appellant.

*Alexander Fried*, with him *Clinton A. Sowers*, for appellee.

OPINION BY MR. JUSTICE MAXEY, June 29, 1935:

On October 22, 1915, Jacob Filderman, appellant, was appointed guardian of Abe Iscovitz, a minor, by the Orphans' Court of Philadelphia County. The sole asset of the minor's estate was a share in certain real estate of which the minor's father died seized and intestate. On February 3, 1920, by order of the orphans' court, the guardian joined with the ward's mother in the sale of this real estate, taking a mortgage in the amount of $3,500. On February 3, 1926, this mortgage was paid, and the proceeds, $3,500 in cash, were deposited at interest for the minor. On March 15, 1926, the guardian withdrew this deposit and invested the entire amount in a trust certificate, designated as "Trust Agreement Deposit No. 1221" of the Central Trust and Savings Company of Philadelphia, organized under the laws of Pennsylvania. This certificate of trust agreement reads in part as follows: "Received of Jacob Filderman, Guardian of the Estate of Abe Iscovitz, a minor . . . $3,500 to be invested by us for account of holder for a period of six years and ———— months, in a mortgage or mortgages to be a first lien on real estate in the City of Philadelphia, State of Pennsylvania, bearing interest at not less than Five Per Cent Per Annum."

On October 6, 1931, the trust company was taken over by the state secretary of banking. By adjudication of the Court of Common Pleas, No. 1, of Philadelphia County, the certificates of the "Trust Agreement Deposit" were held to be trust certificates, and the entire fund of bonds and mortgages comprising the securities of which the certificates represented individual interests, was transferred to John H. Gossling, Esquire, and the Tradesmen's National Bank and Trust Company, as substituted trustees, who are still administering the fund for the benefit of the respective certificate holders. The fund comprises an aggregate of over $1,500,000 worth of first mortgages on Pennsylvania real estate against which there are outstanding and issued $1,500,000 in trust certificates, of which the certificate in the sum of $3,500 here in question is one.

On February 26, 1934, the guardian filed his first and final account of income and principal. The income account has been approved and confirmed absolutely, so that the only matter in controversy relates to the principal account. This shows a balance of $3,500 composed of the certificate of "Trust Agreement Deposit No. 1221." The auditing judge ruled that the certificate was not a legal investment; that it was no investment at all, but a mere "receipt" showing a delegation of duty to the trust company to invest; and that it was not within the terms of the Fiduciaries Act of 1917, P. L. 447, section 41a, as amended in 1923. Exceptions were filed. The orphans' court in banc dismissed the exceptions and confirmed the adjudication absolutely. This appeal followed.

Section 41a of the Fiduciaries Act of June 7, 1917, P. L. 447, provides in substance, inter alia, that a fiduciary may invest moneys in his hands "in mortgages or ground rents in this Commonwealth . . ." This act was amended by the Act of June 29, 1923, P. L. 955, which enlarged the field of investment by fiduciaries by adding to the former act, the following: "or in bonds of one or more individuals secured by mortgage on real estate in

this Commonwealth, which may be either a single bond secured by a mortgage or one or more bonds of an issue of bonds secured by mortgage or deed of trust to a trustee for the benefit of all bondholders." The Act of April 26, 1929, P. L. 817, further amended the Fiduciaries Act, but without deciding whether or not this Act of 1929 would have any bearing on this case if the investment had been made subsequent to it, we need only point out that since the investment was made on March 15, 1926, our decision as to the legality of the investment must be based on the state of the laws existing *at that date.*

The agreement above referred to, further provided that "if requested so to do by the holder," i. e., the guardian, the trust company would at the end of the period purchase the "holder's interest in the mortgage in which holder's funds are invested hereunder, for the amount invested in same, plus any unpaid interest at the rate of five per cent per annum."

It is obvious that the transaction between the guardian and the trust company when stripped of all verbal "window dressing" was that the guardian loaned to the trust company his ward's money at five per cent, and authorized that company to use it (if it so chose) in certain restricted speculative hazards. The trust company was authorized by the guardian to loan the ward's money on a first mortgage on any real estate in Philadelphia at any rate of interest it could get, reserving a return to the ward of five per cent interest. The trust company in effect was invited by the guardian to attempt to secure as high a return to it (the trust company) as possible. While it must be assumed that the trust company would not loan money at a rate in excess of the legal rate of six per cent, nevertheless, the *actual* rate *could* be considerably more than this through the media of bonuses for loans, legal expenses, etc. The acts of assembly governing investments by fiduciaries, on or before March 15, 1926 (the date of the investment), does in language,

tenor, and purport, say to the guardian: "You must make investments of the money entrusted to you, in mortgages or ground rents in this Commonwealth, or in bonds of one or more individuals secured by mortgages on real estate in this Commonwealth, which may be either a single bond secured by a mortgage or one or more bonds of an issue of bonds secured by mortgage or deed of trust to a trustee for the benefit of all bondholders." Under this law a guardian, having no temptation to secure an unduly high yield of interest for his ward, would naturally select investments in which safety was the first consideration. Under the method resorted to here by the guardian and the trust company, the latter would naturally make an investment in which a high yield would be the chief consideration. If, for example, it made a loan on real estate to its full value, at 6% interest and also received a bonus therefor, with a generous charge by its attorney for legal services it would be running no risk whatsoever to itself. The investment might turn out to be a losing one but in that event the loser would be the ward, not the trust company.

The obligation resting on fiduciaries cannot be lightly discharged, as was attempted here, by the guardian loaning his ward's money to the trust company to do as the latter pleased with it, provided the funds were invested in securities which technically conformed to the description of being first mortgages on real estate. President Judge NILES aptly said in his adjudication: "The guardian did not invest his ward's money in any legally authorized securities. On the contrary he delivered it to the Central Trust and Savings Company upon its promise to do what he himself was under legal obligation to do." The court in banc, in an opinion written by Judge VAN DUSEN, also well said: "At no time does he [the guardian] have any control over the identity of the investments, and he does not even know what they are. While the fiduciary may invest in an issue of bonds secured by

a trust mortgage, it is his duty to select the issue himself. This is a duty which he cannot delegate. . . ."

The decree is affirmed at appellant's cost.