## Crane's Estate

Before Van Dusen, P. J., Stearne, Sinkler, Klein, and Ladner, JJ.

*John Wintersteen, Joseph J. Brown, D. Alexander Wieland,* and *John Arthur Brown,* for exceptant.

*Joseph G. Denny, Jr., Robert W. Archbald, Jr.,* and *James F. McMullan,* contra.

*William Carson Bodine* and *Thomas Stokes,* for Fidelity-Philadelphia Trust Company.

*C. H. Latta, Jr.,* for Provident Trust Company.

*Boyd Lee Spahr,* for Land Title Bank & Trust Company.

STEARNE, J., May 23, 1941.—The auditing judge surcharged a corporate cotrustee, and exonerated the individual cotrustee, concerning the investment by the trustees of trust funds in participating mortgage certificates, transferred to the trusts by the corporate fiduciary from other of its trust estates. The participating mortgage

certificates secured an interest in a single first mortgage secured upon improved central Philadelphia real estate. Neither the *form* of the investment nor the *sufficiency* of the security of the mortgage, *when created*, is challenged.

The basis of the surcharge is:

1. There was no reappraisement of the mortgaged premises at the time of acquisition of the respective participating mortgage certificates;

2. While the intrinsic value of the mortgaged real estate remained the same as when the mortgage was taken, yet, at the time of acquisition of the certificates, there was no market for real estate of that character.

The facts may be briefly summarized. On November 4, 1929, Anne W. Penfield, then reputed to be the richest woman in the United States, executed her bond and mortgage to the Girard Trust Company (cofiduciary herein) as "trustee for sundry estates". The mortgage was for $2,500,000, secured upon improved real estate on the south side of Chestnut Street, east of Broad—in the very heart of the business section of Philadelphia. The real estate, at land value, was appraised for $5,000,000. No question is raised concerning the *method* of appraisement, or the amount thereof. Allocations were thereafter made by the corporation to between 500 and 600 trusts wherein it was fiduciary. These were evidenced by participating mortgage certificates. From October 19, 1931, to March 22, 1932, eight of the participating mortgage certificates, in varying amounts and numbers totaling $23,800, were reassigned to the five testamentary trusts herein involved. No objection is raised as to the *form* of the investments. The trustees conceded that there were no reappraisements of the mortgaged premises when the various participating mortgage certificates were reassigned to these trusts.

Our first inquiry is whether the auditing judge was correct when he ruled that a reappraisement was necessary. The next consideration, if reappraisements were not required, is whether the certificates were amply se-

cured by real estate of sufficient value, and of proper character.

Before approaching the question of the necessity for reappraisement of such certificates, the true nature and status of a participating mortgage certificate must be considered. It will suffice to say that the genesis of a participating mortgage certificate was a benign device erected by corporate fiduciaries, whereby the fiduciary placed trust money in a common fund, and invested the same in a single mortgage, or in a group of mortgages, taken as "trustee for various trusts". The trust fund became a "revolving fund" for the benefit of various trusts, and was usually employed for remnant uninvested funds too small for ordinary investment. At the inception the device was employed almost exclusively for minors' small estates, or parts thereof; otherwise, such funds would have remained idle and unproductive. Such funds were relatively modest in amount, and the mortgage investments were kept most liquid and secure. This practice justly merited the approbation of beneficiaries, fiduciaries, and the courts. After this method of investment became firmly established, its scope widened and deepened. No longer was the practice limited to small or remnant funds, but this form of trust investment became a primary subject for extensive trust investments. The fund was still secured by a single mortgage or by a group of mortgages. Large mortgage pools were created, and participating mortgage certificates issued against such pools. Prior to the Banking Code of May 15, 1933, P. L. 624, such certificates were sold to the public as ordinary investments: see opinion of Deputy Attorney General reported in Mortgage Participation Certificates, 21 D. & C. 199. Such method of trust investment received legislative sanction. As the practice developed and expanded, it had imposed upon it many legislative regulations. While the experience of the past few years may raise doubt as to the wisdom of this type of trust investment, nevertheless, legislative and judicial authority therefor exists.

Participating mortgage certificates are beyond all doubt legal investments for trust funds.

The act which confirmed and authorized the issuance of participating mortgage certificates is the Act of April 6, 1925, P. L. 152. The basis for such certificates, as legal investments, is the Fiduciaries Act of June 7, 1917, P. L. 447, sec. 41. The Fiduciaries Act has been variously amended, the last amendment being the Act of June 24, 1939, P. L. 718. There have been many appellate decisions construing these acts of assembly. Crick's Estate, 315 Pa. 581, Rambo's Estate, 327 Pa. 258, and Harton's Estate, 331 Pa. 507, may be cited, as could many others, which construe the Act of 1925, supra. And such certificates, under the Fiduciaries Act and its amendments, are legal investments: Smith's Estate, 332 Pa. 581; Swindell's Estate, 332 Pa. 161; Dillon's Estate, 324 Pa. 252; Harton's Estate, supra.

The question here presented is what is the measure of diligence and care required to be exercised by such a corporate fiduciary when it transfers a participating mortgage certificate from one trust to another. Certainly, under Saeger's Estate, 340 Pa. 73, no *extraordinary* or *unusual* diligence and care is prescribed.

But the auditing judge has ruled that it constituted a lack of common skill, common prudence, and common caution not to have reappraised the mortgaged real estate in transferring a participating mortgage certificate from one trust to another.

Assuming the absence of fraud or knowledge (actual or implied) of a deterioration in the value of such mortgaged real estate, apparently there are two views as to the measure of skill, prudence, and caution required by a corporate fiduciary in so transferring a participating mortgage certificate. One view is that the acceptance of a certificate is governed by precisely the same measure of care as if the fiduciary were making an original investment in a single mortgage, or in any other form of authorized trust investment. Under this view, upon each

acceptance of a certificate, the fiduciary must have the real estate (single or multiple) duly appraised in strict accordance with the act of assembly; it matters not that the corporate fiduciary has issued many hundreds of such participating certificates, and has occasion to daily, weekly, or monthly, make transfers from one trust to another. The other view is that the fiduciary, in accepting such transfer, is only held to good faith and ordinary skill, care, and prudence, and nothing more. To require a reappraisement for each retransfer creates an undue and unjust burden; such a requirement for reappraisement, for all practical purposes, would eliminate a participating mortgage certificate as a legal investment; thus, an investment of $500 or $1,000 in a participating mortgage certificate might entail the cost of the reappraisement of real estate, composed of various types, the cost of which could well consume a large part, if not all, of the investment; in the case of mortgage pools, the reappraisement of hundreds of mortgages would involve even larger costs and expenses. Manifestly, if such reappraisement is essential, investment in participating mortgage certificates would be impracticable, if not impossible.

As noted in the adjudication, one orphans' court judge has followed one view, while another has adhered to the latter. A majority of this court hold to the latter view. It is true the auditing judge suggests that the difficulty could be eliminated by frequent appraisals every few months. However, a perpetual appraisement would appear to be a most expensive and impractical operation.

The legislature has obviously considered the problem. The Act of July 2, 1935, P. L. 545, subsec. (7), provides that no new appraisement is necessary to fix the fair value, if an appraisement has been made in accordance with law *within three years* from the date of the investment. This provision is reënacted in the Act of June 24, 1939, P. L. 718. It is to be noted that it is not mandatory that a reappraisement *shall be* made within three years.

The act, in effect, exempts from liability *if* such appraisement has been so made.

The majority of the court are of opinion that the *legislature*, in so developing the use of participating mortgage certificates as trust investments, clearly indicated that reappraisement was not required. The Acts of 1935 and 1939 (above cited) were passed *after* these particular investments were made. But there were no acts of assembly prior thereto which *required* reappraisement. Had this case been governed by the Acts of 1935 and 1939, these particular certificates were regularly taken as all were transferred well within three years, and after an unchallenged appraisement. Therefore, reflecting the evident meaning of the legislature, a majority of the court hold, under the circumstances of this case, that no reappraisement was required, and that the trustees are only liable in the event that they failed to exercise ordinary skill, care, and caution.

The next inquiry, therefore, is whether the trustees have failed to exercise ordinary skill, care, and caution. The auditing judge has found as a fact that such duty was not performed.

A finding of fact, like a verdict of a jury, will not be disturbed unless there is manifest error or clear mistake: Dempster's Estate, 308 Pa. 153; Copeland's Estate, 313 Pa. 25; Grenet's Estate, 332 Pa. 111. But where findings of fact are *conclusions* based upon uncontradicted evidence, and purely the result of reasoning, the rule is different. In such case the court in banc, and the appellate court, are equally competent as the auditing judge to draw conclusions: Dorrance's Estate, 309 Pa. 151; Boswell's Estate, 109 Pa. Superior Ct. 365, 368.

The evidence is undisputed. Mr. Cullen and Mr. Sinberg both testified that the intrinsic value of the real estate remained unchanged from the date of the mortgage until after the investments; also that there were no buyers for this character of property at the time of the investments. The finding of fact by the auditing judge

was such that such testimony given by these witnesses "are the facts".

Mr. Cullen testified that the absence of market did not reflect on the intrinsic value of the property; also that conditions had not changed the true intrinsic value of the real estate.

Apparently, the auditing judge, from the testimony, concludes that the market value was nil, or zero. His conclusion also is that "intrinsic value, where there is no market, is a speculative value . . ."

We have read the testimony with considerable care, and cannot attribute to it the implications which the auditing judge draws. As we read it, the witnesses did not say that in 1931 and 1932 this real estate possessed *no value whatsoever*. Nor did the witnesses say or infer that the "intrinsic value" which they, or the appraiser, fixed was the result of a speculative consideration.

It is a matter of judicial knowledge that, save in exceptional circumstances not here present, almost every form of tangible property has *some* value and market. It is futile to suggest that most real estate, however undesirable, cannot be sold *at a price*. We cannot agree, from this testimony, that the real estate could not have been sold at *any price* and had no market *at all*. What we deduce from the testimony is that in the opinion of the trustees this real estate "was the most desirable in the center of Philadelphia"; that "eventually that property would be used for the construction of a very large building"; that in October 1931 there were no buyers for large central real estate sites; that the real estate was regarded as being of the kind that would be sold to a purchaser who wanted *"that type ·of property"*. In other words, it was regarded as most valuable real estate to a purchaser who wished to use it for the erection of a large building, or other central real estate development.

Concerning the *time* within which a market is available, it is also a matter of judicial knowledge that there

is a vastly wider market for inexpensive dwellings than for ground which requires the expenditure of enormous sums to purchase and develop. The former class sells quickly, whereas the latter moves much more slowly, because of the limited use and existence of persons willing and able to finance such purchases.

As to intrinsic value: The uncontradicted testimony of Messrs. Cullen and Sinberg was that in 1931 and 1932 the intrinsic value of the real estate was $5,000,000, and unchanged as appraised in 1929. While the auditing judge accepted "as a fact" the testimony of these witnesses, he ruled that "Intrinsic value, when there is no market, is a speculative value depending upon uncertain future events". Again: "It seems to me that a property which does not carry itself, and which has no market value, is not mortgageable no matter what the intrinsic value."

In the view of the majority these findings are *deductions* from the testimony. As we read the testimony it was stated that intrinsic value remained as appraised, even though there were no offers or buyers for the property at the time of investment. We cannot decide that the trustees acted with a lack of skill, prudence, and caution in investing in this participating mortgage certificate where: Within two years the real estate had been conservatively appraised at $5,000,000, at ground value only; the first mortgage was for $2,500,000 (50 percent of its appraised value); it constituted one of the largest assembled pieces of land in central Philadelphia; where the bond and mortgage were executed by the then reputed richest woman in the United States, whose personal property revealed ownership of many millions of dollars of invested personalty; it was known that at or about the time of the execution of the mortgage the owner had declined a firm offer of $6,500,000 as inadequate; and where no default in payment of taxes and interest occurred until after 1932.

It is true that when the mortgage was taken the real estate did not "carry itself". With an unchallenged appraisement of ground value of double the principal of the mortgage, and with the bond of one who was regarded as the wealthiest woman in America, insufficient revenue for carrying the real estate is of little importance. See Heyl's Estate, 331 Pa. 202, 203-204.

These are continuing trusts. No distribution of principal is now being made. An additional reason for refusing a surcharge at this time is that *a loss has not been definitely established.* The real estate taken in foreclosure has not yet been liquidated. According to the record, at the sheriff's sale on December 5, 1938, the real estate was sold to the mortgagee for $2,400,000. This is conclusive evidence of its value: Bugh's Estate, 95 Pa. Superior Ct. 29; White's Estate, 322 Pa. 85; Marsh, to use, v. Bowen, 335 Pa. 314; Skolnek's Estate, 342 Pa. 49. A deficiency judgment was entered amounting to $964,247.41. This judgment has been presented against Mrs. Penfield's estate, which is pending in this court before another auditing judge. According to that record, while the estate *may* prove to be insolvent, there are strong indications of possible solvency. If the estate *is* solvent, and if the salvage operation is completed, it may well be that there will be no loss at all, and the decision in this proceeding may prove wholly academic.

As no surcharge is to be imposed, we shall not consider in detail the question of the exoneration, by the auditing judge, of the individual cotrustees. If the surcharge had been sustained, a majority of the court would have held, in the facts of this case, that *all* of the trustees should be jointly responsible. We would not have limited liability solely to the corporate cotrustee.

The exceptions are sustained and the adjudication, as thus modified, is confirmed absolutely.

VAN DUSEN, P. J., dissenting.—I dissent for the reasons more fully given in my adjudication, which I summarize as follows:

1. An investment in a fraction of a mortgage, like an investment in a full mortgage, must be justified by an appraisement close enough in time to be informative. Two years was not close enough under the circumstances of this case.

2. The transfer from another trust account is in principle no different from a transfer from the trustee's individual account and at least puts upon the trustee the burden of showing a careful contemporary appraisement. This view has been so fully dealt with by Judge Ladner in his dissenting opinion that I will say nothing more about it.

3. The trustees should not have invested in a mortgage on a property which had become unsalable and did not carry itself at the time the investment was made—facts which they ought to have known, and did know.

I also dissent most decidedly from the reason given at the end of the majority opinion for refusing a surcharge, viz, that a loss has not been definitely established.

Ever since I have been in this court, surcharges have been dealt with by directing the fiduciary to substitute cash and take over the investment himself. This has been so universal a practice that nothing about it can be found in the books. It is, however, familiar equity doctrine, viz, that the beneficiary may elect to take an improper investment or to take cash (see Restatement of Trusts, sec. 210). If the investment was improper, then it is the trustee who must take the risk of loss. If in the end there will be no loss, the pocket of the trustee will be saved, and I will be very glad of it. But the beneficiaries ought not to take the risk and wait perhaps for 10 years more, as they have for nearly 10 years last past.

If this reason for the decision is more than a mere makeweight, then the refusal to surcharge at this time will not dispose of the matter and the question can be raised in the future. In that case the exceptions ought to be dismissed without prejudice.

But that is not fair to the trustees. There are three trustees here. One of them is dead. All the trustees are entitled to know now where they stand. The executors of the deceased trustee are entitled to discharge. The living individual trustee is entitled to have the matter determined while he is living and can testify. The corporate trustee is entitled to have the matter determined before its officers who handled this matter die or forget.

LADNER, J., dissenting.—I do not subscribe to the views of my learned colleague who wrote the majority opinion in this case. I would dismiss the exceptions to the learned auditing judge's ruling imposing a surcharge for the following reasons:

1. Because in essence the transaction is an investment of trust funds in a mortgage participation without complying with the act then governing such investments, namely, the Act of April 26, 1929, P. L. 817; and (2) because apart from the act the circumstances as found by the auditing judge showed a lack of prudent care.

So far as the Act of 1929 is concerned, it must be conceded that the legislature has the power to designate what shall be legal investments for trust funds as well as impose conditions and safeguards governing the margin of safety and the methods of ascertaining the same.

The investments here complained of were "participations" in a first mortgage, and as they were made in October 1931 it follows that they should have conformed to the requirements of the Act of 1929, amending section 41 (*a*) of the Fiduciaries Act of June 7, 1917, P. L. 447. That act, so far as applicable here, reads:

"When a fiduciary shall have in his hands any moneys, the principal or capital whereof is to remain for a time in his possession or under his control, and the interest, profits or income whereof are to be paid away or to accumulate, . . . such fiduciary may invest such moneys in . . . *first mortgages* on real estate in this Commonwealth, *securing bonds or other obligations* not exceeding in

amount two-thirds of the fair value of such real estate; or in ground rents in this Commonwealth; or in bonds, payable not more than twenty years after date, of one or more individuals, secured by a deed or deeds of unencumbered real estate in this Commonwealth conveyed to a corporation organized under the laws of this Commonwealth and authorized to act as trustee, in trust for the benefit of all such bondholders, but the total amount of any such bond issue shall not exceed two-thirds of the fair value of the real estate securing it, and the trustee shall not be exempted, by contract or otherwise, from responsibility for performing the ordinary duties of trustees; *or in trust certificates, issued by a trust company organized under the laws of this Commonwealth, certifying that the holders thereof are respectively the owners of undivided interests in deposits, with such trust company, of securities in which trust funds may be invested under the preceding provisions of this clause* . . .

"Within the meaning of this clause, the 'fair value' of real estate shall be the value placed thereon, in writing, by a reputable person, who shall be especially familiar with real estate values, shall have actually inspected the real estate before making his valuation, and shall certify that his valuation was made after inspection of the premises."

While the language of the clause in italics does not, in express language, mention participations in a single mortgage, nevertheless, a somewhat similar clause, in the Act of April 6, 1925, P. L. 152, was held in Guthrie's Estate, 320 Pa. 530, to apply to participations whether issued against a single mortgage or against a so-called pool of mortgages.

Participation investments must meet the standard fixed by the act in force at the time they are made: Iscovitz' Estate, 319 Pa. 277; Harton's Estate, 331 Pa. 507, 519; Erie Trust Company—Mortgage Pool, etc., 17 Erie 9. Here the auditing judge found, and the record clearly shows, that there was no written appraisement by a per-

son "especially familiar with real estate values who actually inspected the real estate before making his valuation", nor certifying a valuation in accordance with the act.

I do not see that it makes any difference in the application of this act that the trustee merely transferred the mortgage participation from one trust, of which it was trustee, to another. On the contrary, such a situation ought all the more to require strict compliance with the act, so as to give assurance to the beneficiaries of the two trust estates involved that the fiduciary acted without favoritism and with strict impartiality to both.

Nor do I consider it any answer to say that to have complied with the act would have been unduly burdensome or expensive. The suggestion to that effect of the learned opinion judge here is based upon a suppositious case not now before us. We are not now concerned with any supposed hardship or expense which might result from literal observance of the Act of 1929 in the case of a "pool" consisting of a large number of small mortgages. When that case arises it will be time enough to consider whether expense, difficulty, or trouble are sufficient excuses for ignoring a statutory requirement imposed upon a trustee for the protection of beneficiaries. Further, it should be noted that in this case the real estate officer of the corporate fiduciary admitted in answer to an inquiry of the auditing judge that such reappraisement could have been made periodically at a very nominal expense.

The omission of a statutory duty is not supplied by the trustee producing an expert who in 1940 testified that the actual or intrinsic value of the mortgaged property as of October 1931, when the investment for this estate was made, was twice the amount of the mortgage. Especially is this so where, as here, an expert of equal standing testified that the fair value of the mortgaged property *then* was only $3,185,000, at which valuation the mortgage would have been about 78 percent instead of 66⅔ percent of the property value at the time the funds of

the Crane estate were invested. Nor do I see how the court is empowered to accept, in substitution for the duty imposed by the Act of 1929, an informal conference between trust company officials who agreed, in effect, that the mortgaged property had not changed in value between October 1929, when the mortgage was made, and October 1931, when the participations complained of were accepted as investments of the Crane estate, and this despite the terrible financial collapse that intervened. Counsel for exceptants press strongly upon us the recent case of Saeger's Estate, 340 Pa. 73. I do not consider that case as controlling authority here because the Supreme Court carefully points out that investments there reviewed were made before the Act of 1929, the Supreme Court saying (p. 80) :

"It was not necessary to make these mortgages legal investments under the applicable provisions of the Fiduciaries Act then in force (Act of June 29, 1923, P. L. 955, sec. 41(a)1) to make any written certification of appraisement, nor were there any statutory requirements with respect to inspection of the property or the proportion which the amount of the mortgage should bear to its fair value."

Apart from the requirements of the Act of 1929, I am of the opinion that the transfer of an asset from one trust estate to another without a preliminary appraisement to fix the value warrants a finding by an auditing judge of lack of ordinary prudence. Section 170 of the Restatement of Trusts, comment q, reads:

*"Duty of trustee under separate trusts.*

"Where the trustee is trustee of two trusts if he enters into a transaction involving dealing between the two trusts, he must justify the transaction as being fair to each trust."

This is but a reflection of the ancient principle long recognized in this State as both good morals and good law that "no man can serve two masters": Everhart v. Searle, 71 Pa. 256, 259. When an asset of one trust estate

is transferred to another, there must inevitably be a conflict of interests. There is thus imposed upon the trustee who represents both estates the careful duty of seeing that the estate that sells gets as much as the asset sold is *then* worth, and on the other hand to see that the estate buying pays no more than the asset is *then* worth. How this can be accomplished, except by the intervention of a disinterested appraiser, is not clear.

We have indicated repeatedly in this court that such is the duty of trustees, and I see no escape from it. To hold otherwise is to encourage the dangerous practice of shifting investments from one trust estate to another as the exigencies of the situation or importunities of the beneficiaries demand—a practice that results in the last estate being left with a frozen non-income-producing investment. The wholesome check which an entirely disinterested appraisement affords ought not to be deemed unnecessary because of fancied trouble or expense.

The learned guardian ad litem in this case has referred to several cases in which we have so held, among which are Judge Sinkler's adjudication in Davis' Estate, 139 October term, 1920, and Abbott's Estate, 149 July term, 1909 (decided in 1937), to which may be added Benges' Estate, where Judge Bolger, speaking for this court, condemned the practice of transferring mortgages and participations therein without appraisement from one estate to another. In Connell's Estate, 32 D. & C. 20 (1938), we upheld a surcharge against an *individual* fiduciary who, as cofiduciary in one estate, transferred a mortgage to another estate of which he was sole fiduciary, without an independent appraisement. We ought certainly to hold a *corporate* fiduciary to no less a measure of duty.

It is difficult to see why the public policy, which precludes a trustee or agent from dealing with himself, is not just as much violated when an agent or fiduciary undertakes to represent both parties. In both relations

the duty of loyalty and duty to administer the trust solely in the interest of the beneficiary, enjoined by many cases and reasserted in section 170 of the Restatement of Trusts, is put to a severe test. In Meinhard v. Salmon et al., 249 N. Y. 458, 464, 164 N. E. 545, the late Justice Cardozo warned of the necessity of an attitude of uncompromising rigidity when courts are petitioned to undermine the principle of undivided loyalty of fiduciaries "by the 'disintegrating erosion' of particular exceptions", and continued that great jurist: "Only thus has the level of conduct for fiduciaries been kept at a level higher than that trodden by the crowd."

I do not understand that Saeger's Estate, 340 Pa. 73, rules differently, for there it was pointed out, as to the mortgage transferred from one trust estate to the other, that it sufficiently appeared from the evidence that the transaction was fair to both trusts, a fact so found by the auditing judge. As to the other mortgages the auditing judge found "on unimpeachable evidence, documentary and otherwise", that they were acquired solely for the purposes of investment for trust funds and so earmarked until assigned with reasonable promptness to the Saeger estate. There was no transfer of them from one trust estate to another, as here, and apparently the appraisement made when the mortgages were acquired was, as found by the auditing judge, not too far removed in time. It also appears that the transaction in that case took place before the financial collapse of 1929.

I dissent also from the suggestion in the majority opinion that, as the trust here continues, the well-recognized practice of directing the improper investment to be replaced with cash is not the appropriate proceeding. To my mind the contrary is true, for under such circumstances the only method that is fair to both the trustee and beneficiary is to require replacement with cash. It is only when a trust terminates and distribution is in order that the establishment of proof of actual loss might be-

come an appropriate remedy, although even then I incline to the belief that the option still remains with the beneficiary to accept the investment and prove the loss or elect to have it replaced with cash. I am in full accord and approve what the learned president judge has said on this subject in his separate dissent.

In view of the disposition made by the majority, it is unnecessary to express any opinion on the question raised by the other exceptions, viz, whether there was error in imposing the surcharge solely on the corporate fiduciary and exonerating its cofiduciary.