# Newcomer Estate

100

*Herbert B. Cohen, Lavere C. Senft* and *Frank Corano*, for accountant.

*McClean Stock*, for exceptants.

GROSS, P. J., March 9, 1956.—The first and final account of Joseph Marinelli and Morris T. Sloan, executors of the last will and testament of Ernest J. Newcomer, late of the Borough of Wrightsville, York County, Pa., deceased, was filed in the Office of the Register of Wills of said York County, on March 29, 1955, and, after due and legal advertisement, was presented for confirmation and audit on May 4, 1955. Exceptions were filed to the account and it, therefore,

became necessary to continue the audit from time to time, and until closed finally on November 21, 1955.

The record in the offices of the register of wills, the clerk of the orphans' court, and the testimony submitted present certain admitted and undisputed facts pertaining to the administration of this estate as follows:

## 1.

Ernest J. Newcomer, decedent, died November 14, 1952. His will, dated December 21, 1950, was probated November 18, 1952, and on the same day letters testamentary thereon were granted to Joseph Marinelli and Morris T. Sloan, the executors therein named, both of whom were residents of the City of Philadelphia. Joseph Marinelli, now deceased, was a practicing attorney at the Philadelphia bar, and Morris T. Sloan was a salesman of automobiles and a personal friend of decedent.

## 2.

This estate is hopelessly insolvent. Excluding the amount due at decedent's death on the first mortgage on the real estate of $38,671.34, it will appear in paragraph 16 thereof that the preferred claims amount to $2,069.22, with $2,000 more disputed and common claims of $57,274.30. It therefore is apparent that no distribution can be made under the terms of the will and it becomes important only because, in the fourth clause thereof, decedent provides that his entire residuary estate, real, personal and mixed, "shall be liquidated by my executors" and the proceeds thereof divided in equal proportions between his wife, Mary E. Newcomer, and Mary Zimmerman, also known as Mae Hauser.

## 3.

The estate of decedent consisted of both personal property and real estate. The personal property was composed of a large number of shares of corporate

stock of only nominal value, two small bank deposits, household furniture, live stock and farming implements on his farm on which he resided, all of which personalty was appraised at $5,306.51, with which amount the executors charge themselves in their principal personalty account and also charge themselves with the further sums of $815.08, the proceeds from the sale of personal property, not included in the appraisement. They take credits thereagainst in the amount of $5,995.72, and show a balance thereon for distribution of $165.87.

4.

The realty income account is an admixture of income from realty and income from personalty. However, the commingling of these two sets of income does not materially affect the rights of creditors and we will disregard the form in which the account is filed. This commingled account shows debits of $4,877.01, and credits thereagainst in the same amount, and, therefore, no balance for distribution.

5.

The real estate of which decedent died seized was a farm situate in the Township of Hellam, York County, composed of four contiguous tracts, containing a total of 105½ acres of land. This farm was improved with two dwelling houses, large barn and other necessary outbuildings and, according to statements made by the decedent shortly before his death, this farming enterprise represented an investment by him of approximately $100,000. The farm was appraised at $42,000.

6.

At the time of his death, the Western National Bank of York held a first mortgage lien on said farm, on which the balance due at that time was the sum of $38,671.34. In addition to the amount due on the

first mortgage, Ervin M. Spangler held a judgment against the decedent entered in the Court of Common Pleas of York County, Pa., a second lien, in the sum of $9,000.

7.

During the process of the administration of this estate, the executors made the following payments to the mortgagee on account of principal and interest on said mortgage, to wit:

| | |
|---|---:|
| December 5, 1952, interest | $ 415.00 |
| March 4, 1953, principal and interest | 865.00 |
| May 27, 1953, principal | 450.00 |
| July 24, 1953, principal and interest | 859.38 |
| September 8, 1953, principal and interest | 853.75 |
| December 3, 1953, principal and interest | 842.50 |
| March 1, 1954, principal and interest | 836.88 |
| Total payments | $5,122.51 |

The first six of the above payments on said mortgage appear as credit items in the principal personalty account, and the seventh or last payment appears as a credit item in the income realty account.

It was stipulated by counsel that the above payments of $5,122.51 represents the sum of $2,700 paid on account of principal, and the sum of $2,422.51 on account of interest on said mortgage.

8.

On October 14, 1953, the Western National Bank, holder of said mortgage, instituted foreclosure proceedings in the Court of Common Pleas of York County, on which it recovered a judgment by default on November 12, 1954, in the amount of $35,971.34. It immediately issued a levari facias and the farm was sold at sheriff's sale December 31, 1954, to the mortgagee for the sum of $1,500. The costs of the mortgage foreclosure proceeding amounted to $1,081.-

04, leaving $451.96 out of the sale price to be applied on the payment of the mortgage. On April 19, 1955, the Western National Bank sold the said farm to Fred R. Bingaman and his wife, for the sum of $41,000.

### 9.

The farm was operated by decedent for a number of years. He regularly employed a male farmer and a female housekeeper to assist him in the operation of the farm and, at the time of his death, one Edgar W. Burnham and one Mae Hauser, a residuary legatee in his will, were so employed by him.

### 10.

The executors also take credit in their principal personalty account for the amount paid by them for fire insurance on buildings on the farm as follows:

March 12, 1953, Henry G. Heller..........$ 77.25
June 8, 1953, Henry G. Heller..... .. .. 265.52

Total . . ....... ......... ........ $342.77

### 11.

A credit is also taken in the principal personalty account for the cost of the operation of the farm in the amount of $839.10.

### 12.

No principal realty account was filed, and for the reason that the real estate was sold under a mortgage foreclosure. Accountants take credit in their income realty (commingled) account for having paid Mae Hauser for taking care of the farm as follows:

December 5, 1952......... .. ........... $ 50
December 27, 1952.... ... ............... 100
June 8, 1953................. . ........ 50
February 26, 1954 . .... . .. .. 50

Total ... .. . .. . . .. $250

## 13.

Accountants also take credit in their income realty account for payments made to Metropolitan Edison Company, for electric current; and King Oil Service Company, for fuel, oil, gasoline and grease, beginning with December 5, 1952, and running through the months of January, February, May, June, August, October and December of 1953 and the months of January, February and September of 1954.

The total amount paid to Metropolitan Edison Company was the sum of $368.52.

The total amount paid to the King Oil Service Company was the sum of $723.73.

## 14.

On October 15, 1953, at the instance of Mary E. Newcomer, the widow, this court awarded a citation against the executors to show cause why they should not be removed because of their failure to cause an inventory and appraisement to be made and filed of the assets of decedent and because of their failure to proceed with the administration of said estate.

On October 20, 1953, the election of Mary E. Newcomer, widow of decedent, to take against the will of her husband was recorded in the office of the recorder of deeds, and was filed in the office of the clerk of the orphans' court on December 18, 1953. Her claim for her family exemption was filed in this court on November 23, 1954, and subsequently confirmed by the court.

## 15.

Pursuant to said citation, the executors filed an inventory and appraisement on November 2, 1953 and, on November 23, 1954, the court entered a consentable decree directing the executors to file an account of their administration of this estate on or before January 1, 1955, pursuant to which decree

the instant account of the executors was filed on March 29, 1955.

16.

Recurring to paragraph 2 hereof, relating to the insolvency of this estate, we observe that the executors have attached to the account a long list of creditors with the amount of their respective claims. Some of the claims are costs of administration, some are preferred claims and other common claims. We will classify all claims presented with respect to their numerical priority as provided by section 622 of the Fiduciaries Act of April 18, P. L. 512, 1949. All claims except the amounts claimed by executors for compensation, and by their counsel, for fees, are admittedly valid claims and will be allowed without further comment.

17.

*Classification of Claims Including Request for Two Additional Credits*

1. Costs of Administration:
   a. An additional credit is requested and allowed for costs of filing the account . . $ 19.00
   b. An additional credit is requested and allowed for fee paid to Herbert B. Cohen, Esq., of counsel for executors . . . . . . . . . . . . . . . . . . . . 100.00
   c. Claim of Clerk of Orphans' Court for filing fees . . . . . . 23.00
   d. Claim of Florence M. Dickinson, for clerical services . 2.28
   
   ————— $144.28

2. Family Exemption:
   Claim of Mary E. Newcomer, widow, for family exemption . . . . . . . . . . . . . . . . . . . . . . . 750.00

3. Costs of funeral, medicines, doctor bills, etc.:

   a. Marlyn D. Etzweiler, funeral bill .............. ... $640.50

   b. Dr. John L. Atkins, medical services ................ 309.00

   c. Dr. I. L. Moyer, medical services ................ 169.00

   d. Tax collector of Hellam Township, 1952 County and road taxes .. ......... .. 56.44

                    ——————— 1,174.94

6. All other claims:

   Common claims. The names of thirty-three claimants, with the amounts of their respective claims will appear in the Schedule of Distribution, totalling as presented.............$57,274.30

In addition to the above classified claims and as costs of administration, the following claims have been filed:

   (a) By the executors, for compensation as executors ........................$1,000

   (b) By the counsel for the executors, for fees ............................ 1,000

The three excepting creditors have manifested their objection to the allowance of the executors' claim by filing their exception no. 8 thereto, and, by their exception no. 9, make no objection to the allowance of counsel fees, provided the same is allowed in proportion to the assets administered and accounted for by the executors.

These two claims will be considered in our hereinafter disposition of the creditors' exceptions nos. 8 and 9.

*Disposition of Exceptions*
*Widow's Exceptions*

On May 3, 1955, exceptions to the account were filed on behalf of Mary E. Newcomer, the widow, as follows:

Exception no. 1 relates to the failure of the executors to itemize certain unappraised personal property accounted for in the amount of $815.08. This exception is general in form and makes no complaint that the amount received for said unappraised personal property was less than its real value. No surcharge could result from it, if it were sustained. We further observe that the executors in their answer filed to this exception fully itemized said unappraised personal property. This exception is dismissed.

Exception no. 2 relates to the payments made by the executors to the Western National Bank, mortgagee, on account of principal and interest on the mortgage. This exception covers the same subject matter as exception no. 1 filed by Kay M. Busser, exception no. 1 filed by the First National Bank of Wrightsville, and exception no. 1 filed by Marlyn D. Etzweiler, creditors. (See paragraphs 7 and 8 of this report.) This exception, filed by the widow, will be hereinafter considered in conjunction with exceptions no. 1 filed by said creditors.

Exception no. 3 relates to the transfer of $839.10 from the credit side of principal personalty account to the debit side of the income realty account. This exception purports to represent the cost of the operation of the farm by the executors. By reason of the insolvency of this estate the mere fact of the transfer of this item from one account to the other cannot adversely affect the rights of exceptant but, inasmuch as the impropriety of the operation of the farm is specifically raised by exceptions nos. 4, 5 and 6 filed by the above creditors, we will hereinafter give con-

sideration to this exception filed by the widow in our discussion of exceptions nos. 4, 5 and 6 filed by the three creditors relating to the same subject matter.

Exception no. 4 relates to the failure of the executors to pay the widow her family exemption of $750. The failure of the executors to pay the widow her exemption is not the subject of an exception to the account, but we will consider it in the nature of a claim by her. (See paragraph 15 hereof.)

We hold that the widow is entitled to her exemption, and we will award it to her in the schedule of distribution as a preferred claim.

### Creditors' Exceptions

On May 3, 1955, 10 exceptions were filed on behalf of Kay M. Busser, the First National Bank of Wrightsville, and Marlyn D. Etzweiler, creditors of this estate. These exceptions, although severally filed by these three creditors, are facsimile in form and subject matter, will be treated and considered as though jointly filed by them.

Exception no. 1, filed on behalf of each of the said three creditors and exception no. 2, filed on behalf of the widow, all relate to the same subject matter, that is, to the payments made by the executors to the Western National Bank, mortgagee, on account of principal and interest on the mortgage held by said bank. (See paragraphs 7 and 8 of this report.)

These payments, representing $2,700, on account of principal, and $2,422.50, on account of interest on said mortgage, a total of $5,122.51, raise rather serious questions for determination.

The fourth item of decedent's will, directing the liquidation of his real and personal estate clearly worked an immediate equitable conversion of his real estate: Kikel v. Kikel, 372 Pa. 200; and Haak Estate, 165 Pa. Superior Ct. 180. And that being so, if the executors had actually sold the real estate, their ac-

counting of the proceeds would necessarily have been treated as personal property, Bateman's Estate, 62 Montg. 177, and distributed among the creditors according to law.

In Moreland Estate, 349 Pa. 374, the Supreme Court reaffirmed the bankruptcy rule as laid down in United Security Trust Company Case, 321 Pa. 276; Erie Trust Company's Case (No. 2), 326 Pa. 218, and Emlen's Estate, 333 Pa. 238, and firmly fixed the doctrine that a secured creditor of an insolvent decedent's estate who elects to retain his collateral as this mortgagee did, is entitled to claim only the balance due on the principal of the debt and interest to decedent's death, after deducting the value of the collateral. And further, the rights of the creditors of insolvent decedent's estates are fixed as of the time of his death and from that date no additional interest accrues.

Here the Western National Bank held a mortgage on the real estate, which was prior to all other liens, on which was due at decedent's death, the sum of $38,671.34 and, because of the insolvency of the estate, this sum, under the doctrine of Moreland Estate, supra, was definitely fixed at decedent's death and could not grow into a larger amount.

Under section 1 of the Act of April 30, 1929, P. L. 874, as well as under section 547 of the Fiduciaries Act of 1949, the executors could not effect a sale of the real estate under their power of sale, nor could this court have authorized a sale, which would have discharged the lien of this mortgage without the consent of the mortgagee.

The executors' power of sale was, therefore, in a manner limited, and their efforts to sell undoubtedly hampered and perhaps to a degree frustrated. But, notwithstanding these handicaps, the executors, by accepting their appointment as such, were placed in the same position exactly as personal representatives

find themselves under section 501 of the Fiduciaries Act of 1949, and it became their duty to take possession of the real estate and, by the exercise of reasonable business prudence, control and maintain it and make all reasonable expenditures necessary to preserve it until sold by them within a reasonable time after the granting of letters testamentary to them.

In furtherance of their duty with respect to the sale of this real estate, Morris T. Sloan, the surviving executor, testified that he and his coexecutor (now deceased) listed the farm for sale with a firm of reputable real estate brokers in the City of York, and also furnished a brochure of the real estate to every other real estate broker in and around the City of York. He further testified that he was a personal friend of decedent and had lived on his farm for a period of two years and, from conversations had with decedent, he was informed that this farming enterprise represented an investment of about $110,000, and that decedent had been offered $85,000 for the farm prior to his death; that the executors were advised by the real estate broker that the farm was worth from $75,000 to $85,000, but that, if an offer of $60,000 was received by the broker, he was instructed to contact the executors. No such offer was ever received by the executors.

The witness further testified that he believed the farm was worth $75,000 and, if sold at its real value, the lien creditors could be paid in full and the estate perhaps be made solvent.

The executors and their counsel (which of the counsel is not revealed in the record) consulted with the mortgagee and it refused to waive payment of the installments as they fell due and insisted upon prompt payment of the same.

This refusal of the bank was in the nature of a veiled threat to foreclose on the mortgage, and, with

full knowledge of the insolvent condition of this estate, and for the alleged purpose of forestalling foreclosure proceedings on the mortgage, said payments on the mortgage were made by the executors.

There is no evidence that the executors made the payments on the mortgage in consideration of a valid agreement by the mortgagee not to foreclose or to give its consent to a discharge of the lien of the mortgage if a sale of the real estate was effected by the executors.

We examined the record of the mortgage and found that it provided for the payment of principal in quarterly installments of $437.50, with interest at five percent to the date of payment and, in the case of default for a period of 30 days, the whole principal fell due.

It will be observed that the first payment of interest, in the amount of $415, was made by the executors on December 5, 1952, just 17 days after decedent's death and thereafter, at regular intervals, payments were made during the year 1953, on account of interest and principal, totaling $3,807.63, and the final payment made on March 1, 1953, of $836.88, making total payments on account of principal and interest on the mortgage of $5,122.51.

During the interim of time while these payments on the mortgage were being made, the executors had made no effort to sell the real estate at public sale, with or without the consent of the mortgagee. True, they had delegated the performance of their duty to a firm of local realtor brokers to find a purchaser at private sale, but a fiduciary will not be absolved from the exercise of reasonable business prudence in the performance of a duty involving discretion and judgment by delegating his duty to another: Clabby's Estate, 338 Pa. 305; Seamans' Estate, 333 Pa. 358; Iscovitz's Estate, 319 Pa. 277.

It is not our purpose to impute fraud or dishonesty to these executors in making payments on this mortgage. They probably did so in good faith and with high motives, but good intentions alone do not excuse the doing of something which the law specifically says shall not be done.

Here this estate was known by the executors to be insolvent and, after delegating their duty and responsibility of exercising reasonable business prudence to effect the sale of this real estate within a reasonable time, they allowed the whole matter to drift along and, in the meantime, appeased the mortgagee, by making payments on account of principal and accruing interest, with moneys in which all creditors had an interest, until they no longer had any funds to make further payment and then the mortgage foreclosure proceedings ensued, judgment entered by default, and the real estate sold at sheriff's sale, unattended by the executors, on December 31, 1954, to the mortgagee for $1,500, and the mortgagee, on April 19, 1955, resold the real estate for $41,000.

Under the terms of the mortgage, the mortgagee had the legal right to foreclose and become the purchaser of the real estate. The fact that the mortgagee resold the real estate three and one-half months after the sheriff's sale suggests that, if the executors had been more alert in the performance of their duties, they, too, might have been able to secure a purchaser at a price advantageous to the estate and at least saved themselves from a surcharge for the amount paid by them on the mortgage.

The payments made on account of the principal and accrued interest on the mortgage, as we have already stated, were probably made in good faith by the executors and for the purpose of protecting the interest of the estate, yet as a matter of fact the entire interest

was lost, together with the money used by the executors in the hope of saving it.

In Donnelly's Estate, 246 Pa. 308, at page 322, the Supreme Court held:

"Where money is so used and is lost, the executors are properly chargeable with the loss. If the executors felt that such expenditures were necessary in the interest of the estate, before proceeding in the matter they should have applied for the approval of the orphans' court, and have given notice to the creditors, and all parties in interest. Not having taken this obvious step to protect themselves, they must be held responsible for the result of the exercise of their judgment."

No such protective proceeding was taken by the executors in this court and they must, therefore, be held responsible for exercising an erroneous business judgment.

A fiduciary has no right to make advance payments to certain creditors, to the exclusion of others and, if he does so, he takes the risk of the solvency of the estate: Moran's Estate, 261 Pa. 269. Neither can he be relieved by a mistaken payment made to a wrong person: Blish Trust, 350 Pa. 311.

The executors advance the defense against a surcharge of these payments on the mortgage that they made same under the advice of counsel.

It is undoubtedly the law that, where a fiduciary exercising ordinary prudence, acts in good faith and under the advice of a competent lawyer, he is not liable for mistakes of law nor errors of judgment: Dempster's Estate, 308 Pa. 153; Henry's Estate, 341 Pa. 439. The errors here involved are not principally matters of law, but matters of business judgment, and our courts have said that, in such case, the opinion of a lawyer has no more value than that of an ordinary business man. Reliance, therefore, upon an attorney's

advice on such matters will not exclude their improvident and improper conduct: Lechler's Appeal, 10 Sadler 547; Smith's Estate, 14 W. N. C. 93; Reik's Estate, 18 D. & C. 252; Rohrbaugh Estate, 3 Fiduc. Rep. 225; Kline's Estate, 280 Pa. 41.

The only evidence that the executors acted under the advice of counsel is the testimony of Executor Sloan, himself. Although they had four practicing attorneys to advise the executors, he failed to state which one or whether all of them advised the payments on the mortgage. Two of the counsel were present in court attending the hearing and participated in the taking of the testimony, and neither of them was called as a witness to corroborate the testimony of Executor Sloan. The testimony in support of the fact that these executors acted under advice of counsel is so meager and devoid of substance that we must regard it as wholly insufficient to establish that fact. We realize that this surcharge is a serious matter to these executors, but we must also keep in mind that they were conducting a serious business on behalf of this estate.

It is the opinion of this court that the payments made on the mortgage were in the nature of distributional payments without an audit and resulted in giving a preference to the mortgagee to which it was not legally entitled and, therefore, made at the risk of the executors. See Donnelly's Estate, 246 Pa. 308; Free's Estate, 327 Pa. 362, for a full discussion of the principles here involved. Counsel for the executors cite Burton's Estate, 3 Dist. R. 755, and Hall's Estate, 10 Dist. R. 215, as authority for making said payments, but both of said decisions were rendered long before the bankruptcy rule was in effect and, therefore, have no application to the facts of this case. The decision in Reel's Estate, 272 Pa. 139, also cited by counsel for the executors, is in complete harmony with the decision in Donnelly's Estate, supra. We sustain

the exception and surcharge the executors with the sum of $5,122.51.

Exception no. 2 relates to the payment of $341.77 for fire insurance on the buildings of decedent's mortgaged premises. The evidence shows that this was the cost of fire insurance carried after the death of decedent.

The fourth item of the will having worked an equitable conversion of the real estate, it became the executor's duty, under section 501 of the Fiduciaries Act of 1949, to take possession of the real estate, control it and make all reasonable expenditures necessary to preserve it, which, of course, includes insurance against loss by fire, and, if they had not done so, and loss would have occurred, they certainly would have been looked upon as having not used the care of ordinarily prudent business men and would have made themselves personally liable for the loss.

Section 501 of the Fiduciaries Act of 1949 expressly authorizes personal representatives, at the expense of the estate, to protect themselves, their employes and beneficiaries by insurance from liability to third persons arising from the administration of the estate, and section 523 of the same act protects personal representatives in the exercise of their inherent powers and duties. While we find no express statutory authorization of personal representatives to carry fire insurance upon assets of the estate, it is clearly one of their inherent powers and duties to do so: Anderson Estate, 77 D. & C. 74; Reiff's Estate, 49 D. & C. 119; McNickle v. Henry, 9 Phila. 243; Ketran's Estate, 24 Dist. R. 1087, and Hurley's Estate, 13 Phila. 276. There is no allegation that the costs of the insurance was excessive. We, therefore, dismiss this exception.

. . .

Exception no. 4 and widow's exception no. 3 relate to the item of $839.10, the cost of the operation of the

farm by the executors. This decedent died November 14, 1952, and to all intents and purposes this farm was only operated until the middle of March of 1953, a reasonable period of time necessary to preserve the personal property until the executors could effect a sale of the same.

We also observe that the total income of the farm, as shown in the income real estate account, was $4,037.91, and the expenses were $4,877.01. Thus, there was an apparent loss of $839.10 from the operation of the farm, but we also observe that there is included among the expenses of operating the farm, an item of $836.88, paid on March 1, 1954, to the mortgagee, for interest and principal on the mortgage, and if we eliminate this item of $836.88 for which we have already surcharged the executors, it would appear that the loss in the operation of the farm only amounted to $2.22. We cannot say that the executors used bad judgment in operating the farm and the amount could well come within the de minimis rule. We dismiss this exception.

Exceptions nos. 5 and 6. No. 5 relates to the payment to Mae Hauser, a caretaker of the farm, the amount of $250 (see paragraph 12 of this report). There is no allegation that the amount paid Mae Hauser was excessive for the services rendered by her. The exception goes to the liability of this estate for the payment of her of any sum for her services rendered to this estate as caretaker, and no. 6 relates to the payment of $368.52 to the Metropolitan Edison Company, for electric current, and the sum of $723.73, to King Oil Service, for gasoline, oil and grease. (See paragraph no. 13 of this report.) The electric current and the gasoline, oil and grease were furnished after the death of decedent and during the period of time that Mae Hauser was acting as caretaker of the premises.

These two exceptions involve the same principles of law and will be discussed and disposed of together.

In Nagle's Estate, 305 Pa. 36, decedent died in 1925, leaving real and personal property amounting to well over a million dollars. His real estate consisted chiefly of a 230-acre farm. By his will, testator left the residue of his property, real and personal, in trust, to the executors, as trustees, declaring that it should be held, invested and reinvested by the trustees for and during the respective lives of his wife, Ellen R. Nagle, and his daughter, Edith A. Nagle, and the survivor of them. His will further provided that the trustee (with the consent of the wife, during her life, and the daughter, during her life) shall have the right to convey the real estate and, when so conveyed, the proceeds shall fall in and become a part of the corpus of the trust.

The trustee continued to operate the farm. The widow continued to live on the farm until the house burned. It was not insured and she was compelled to move elsewhere. The executors filed their second account in which they took credit for loss in operation of the farm of $6,500, one third of which was charged against the widow's income. The executors also charged the estate with office and telephone rent amounting to $2,368.04. The widow filed exceptions to these two items, and the court below surcharged the executor with both amounts.

The similarity of facts between the Nagle Estate and the Newcomer Estate is apparent. In the Nagle Estate the trustees, under their power of sale, could sell the real estate only with the consent of both the wife and daughter. The daughter refused to give her consent. In the Newcomer Estate, the executors, under their power of sale, could not make a sale discharging the lien of the mortgage without the consent of the mortgagee. The mortgagee refused to give its consent

and, therefore, in both estates the discretion of the fiduciary having the power of sale was limited.

Justice Kephart, in disposing of the appeal with reference to the surcharge for the cost of operating the farm, in Nagle's Estate, aptly remarked:

"The executors or trustees no doubt concluded that the only wise thing to do, pending consent by Edith Nagle, was to keep the farm in a fair state of repairs so as to make it attractive for sale purpose. They could not do this by letting it grow up in weeds, with the fences down and the buildings dilapidated. They were authorized and required to do what was reasonably necessary to keep up the property. It was, of course, the duty of the trustees to take every reasonable and possible means of reducing any loss the beneficiaries might suffer.

"Taking the evidence as a whole and the findings of the trial judge, it would seem that the conduct of the trustees in managing the estate with respect to this property did not measure up to the requisite standard. The trustees were a trifle careless, and, while they should be punished, we can readily see that farms, perhaps, cannot be operated in these times at a profit; the loss here, however, was too great. Entire fairness would seem to require the surcharge on this item to be modified. It is fixed at $2,500 covering the period of five years."

As to the surcharge of $2,368.04 for office and telephone rent, the Supreme Court set aside the surcharge on the grounds that the expenditure was reasonably necessary and moderate in amount.

As we view these two exceptions, the expenditures made by these executors were reasonably necessary "to keep the farm in a fair state of repair so as to make it attractive for sale purposes" and the amounts expended were not exorbitant. We dismiss exceptions nos. 5 and 6. . . .

Exception no. 8 is not an exception. It is merely an objection to the allowance of compensation to the executors. We have given considerable thought to the propriety of allowing these executors compensation for the services rendered in the administration of this estate. The management of this estate by the executors with regard to the real estate did not measure up to the required standard, and we, therefore, surcharged them with the wrong payments on the mortgage, but we absolved them from mismanagement of the personal estate by dismissing the exceptions filed in reference thereto.

The difficulty in the management of this estate, in all probability, arose out of the fact that both executors resided in Philadelphia, almost 100 miles away from the location of their activities, which, undoubtedly in part, accounts for the prolonged administration of this estate. However, after full consideration of all of the facts appearing on the record, we are not convinced that they should go without any compensation whatsoever.

The creditors of this estate are not entirely immune from some criticism because of their own apparent indifference and lack of interest in protecting their rights by failing to take some aggressive action in this court to force a more expeditious administration of this estate.

As heretofore stated, we have no reason to believe that these executors were dishonest. After giving full consideration to all of the facts and it being largely in the discretion of this court, we refuse the request of $1,000 for executors' compensation and will allow the executors the sum of $400 as compensation in the administration of this estate. See Strickler Estate, 354 Pa. 276; Faust Estate, 364 Pa. 529; Bennett Estate, 366 Pa. 232, and Landis Trust, 382 Pa. 486.

Exception no. 9 is not an exception. It is merely a statement by the excepting creditors that they do not object to the allowance of reasonable counsel fees to counsel for the executors. After giving full consideration to all the facts pertaining to the administration of this estate and that the matter of fees for counsel to executors is in a large measure in the sound discretion of the orphans' court, we have concluded that the personal assets which came into the hands of the executors amounted in round numbers to about $11,000; that the fee of $1,000 requested by counsel, under all the circumstances, is excessive and we, therefore, allow a fee to counsel of $500, of which the sum of $100 has already been paid to Herbert B. Cohen, Esq., and an additional credit allowed therefor. See Ward Estate, 350 Pa. 144; Huffman Estate (No. 3), 349 Pa. 59. . . .

Exception no. 14 relates to the failure of the executors to procure the real value of the household goods, farm stock and equipment. The burden of sustaining this exception was on the exceptants and no evidence having been offered to sustain it, this exception is dismissed. . . .

Exception no. 16 relates to the payment of $50, appraisers' fees, for appraising the estate of decedent. Section 11-k of the Fiduciaries Act of June 7, 1917, P. L. 447, left the matter of the fixing of the appraisers' fees in the discretion of the orphans' court. While this act was repealed by the Fiduciaries Act of 1949, we have not been pointed to any act of assembly fixing or regulating the fees of appraisers, and we, therefore, assume that this matter is still left in the discretion of the orphans' court.

The appraisers both resided in the City of Philadelphia, a distance of at least 90 miles from the residence of the decedent. They visited the premises of decedent about two months after his death and held the ap-

praisement but, for some reason unexplained, it was not filed by the executors until November 2, 1953, and then only after being cited to do so. The delinquency of the executors in filing the appraisement caused no harm to the estate and, therefore, after giving full consideration to the character of this estate and the duties of the appraisers, we are not prepared to say that a fee of $25 to each appraiser, or a total of $50, was excessive and we, therefore, dismiss this exception.

*Adjustment of Account and Schedule of Distribution*

| | |
|---|---:|
| Balance on principal personalty account as filed | $ 165.87 |
| Add | |
| Surcharge for wrongful payments on mortgage | 5,122.51 |
| Surcharge for wrongful payment of check. | 25.00 |
| Amount receive from sale of stock | 25.00 |
| Making total balance | $5,338.38 |

Deduct additional costs of administration as follows:

| | | |
|---|---:|---:|
| Additional costs of filing account | $ 19.00 | |
| Payment to Herbert B. Cohen, Esq., on account of fee | 100.00 | |
| Award to Clerk of orphans' court fees | 23.00 | |
| Award to Florence M. Dickinson, services | 2.28 | |
| Compensation allowed to executors | 400.00 | |
| Compensation allowed to attorneys for executors | 400.00 | |
| | | 944.28 |
| Leaving balance | | $4,394.10 |
| Balance brought forward | | $4,394.10 |

Preferred claims awarded as follows:

To Mary E. Newcomer, family exemption, Horace G. Ports, atty.. $750.00
To Marlyn D. Etzweiler, funeral bill, McClean Stock, Atty........ 640.50
To Dr. John L. Atlee, medical services ............................ 309.00
To Dr. I. L. Moyer, medical services 169.00
To Tax Collector of Hellam Township, county and road tax...... 56.44
                                                    ———————— 1,924.94

Leaving balance for distribution to common creditors........ $2,469.16

The total amount of common claims is the sum of $57,274.30 and the above balance is awarded on the basis of 4.3111% of their respective claims as follows:

|  | Claims | Awards |
|---|---|---|
| George Ansbach (note)........$ | 1,500.00 $ | 64.67 |
| Frank D. Bentz and Albert M. Bentz ..................... | 142.84 | 6.16 |
| Walter E. Fry, notes .......... | 2,149.92 | 92.69 |
| Fulton Mehring & Hauser ..... | 20.90 | .90 |
| O. L. Glackin (note) .......... | 600.00 | 25.87 |
| King Oil Service ............. | 249.20 | 10.74 |
| Harold R. Kline ............. | 2.90 | .13 |
| Andrew Melhorn ............. | 116.37 | 5.02 |
| Picking Bros. ................ | 375.20 | 16.18 |
| Red Lion Spraying Service ..... | 9.00 | .38 |
| H. M. Rehmeyer ............. | 31.40 | 1.35 |
| C. F. Shutter & Son ......... | 33.62 | 1.45 |
| Irvin M. Spangler (book account).....$2,978.75 |  |  |
| Irvin M. Spangler (note) ........... 2,100.00 |  |  |
| Irvin M. Spangler (judgment) ....... 9,000.00 |  |  |
|  | ———————— 14,078.75 | 606.95 |

| | | |
|---|---|---|
| P. W. Strickland | 226.21 | 9.75 |
| White Rose Seed & Nursery Co. | 37.20 | 1.60 |
| York Farm Bureau Cooperative | 50.78 | 2.19 |
| York Farm Supply Co. | 26.98 | 1.16 |
| York Stone and Supply Co. | 91.58 | 3.95 |
| Morris T. Sloan | 1,500.00 | 64.87 |
| Drovers & Mechanics National Bank of York | 203.00 | 8.75 |
| First National Bank of Wrightsville (note) | 1,100.00 | 47.42 |
| Western National Bank of York (note) | 1,300.00 | 56.04 |
| Kay Busser .........$30,000.00 | | |
| Kay Busser — Judgment ............ 2,500.00 | | |
| | 32,500.00 | 1,401.11 |
| George M. Leader | 200.00 | 8.62 |
| Estate of B. W. Brown | 388.00 | 16.73 |
| Edward M. Ream | 340.45 | 14.68 |
| Total claims | $57,274.30 | |
| Total awards | | $2,469.16 |

We enter the following

### Decree

And now, to wit, March 9, 1956, it is hereby ordered, adjudged and decreed that, subject to our rulings on exceptions filed to the account of Joseph Marinelli and Morris T. Sloan, executors of the Estate of Ernest J. Newcomer, late of the Borough of Wrightsville, York County, Pa., deceased, is confirmed absolutely, and it is further ordered, adjudged and decreed that said accountants pay the distributions to the persons entitled to receive the same as set forth in the foregoing schedule of distribution.

This decree is entered nisi and, in the absence of exceptions filed thereto within 10 days from the date hereof, the same shall become final, as of course.

*Opinion and Decree Dismissing Exceptions*

Exceptions were filed on March 19, 1956, by Joseph Marinelli and Morris T. Sloan, executors of the Estate of Ernest J. Newcomer, late of the Borough of Wrightsville, York County, Pa., deceased, to the court's rulings and decree entered in the matter of the adjudication and audit of the first and final account of said executors, and argument thereon having been heard by the court by written briefs filed by counsel and, after reviewing all of the evidence in the record and after giving further careful consideration to the thoroughly prepared arguments of counsel, we are not convinced of the validity of any of the exceptions filed.

The opinion filed with the decree entered of March 9, 1956, and the reasoning thereof, is now adopted by the court; the exceptions thereto are dismissed, and the decree entered on March 9, 1956, is hereby entered as the final decree of the court in this proceeding.